**J. M. YOUNG, Appellant,**

v.

**ETHYL CORPORATION et al., Appellees.**

**No. 74–1775.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1975.

Decided July 25, 1975.

Rehearing and Rehearing En Banc Denied Sept. 12, 1975.

Robert J. Moffatt, Shreveport, La., for appellant.

Robert J. Malinak, Houston, Tex., for appellees.

Before HEANEY and WEBSTER, Circuit Judges, and NANGLE, District Judge.*

---

* JOHN F. NANGLE, District Judge, Eastern District of Missouri, sitting by designation.

HEANEY, Circuit Judge.

In this diversity action, plaintiff-appellant Young seeks an injunction and damages or an accounting for the defendants' actions in forcibly removing valuable minerals from beneath his land by means of injection and production wells on surrounding property. The District Court dismissed his complaint after a trial on the merits. *Young v. Ethyl Corp.,* 382 F.Supp. 769 (W.D.Ark.1974).

The defendants hold mineral leases on approximately 16,000 acres of land overlying the "Smackover Limestone Formation" in Columbia County, Arkansas. Their salt-water recycling operation brings salt water brine from a depth of 8,000 feet to the surface by means of production wells. Valuable bromine is extracted from the brine, and the debrominated water is then injected back into the ground through injection wells in a process which forces the subterranean brine toward the production wells.

Young's land, consisting of approximately 180 acres, is surrounded by land controlled by the defendants. The defendants attempted to acquire a salt water lease from Young, but were rebuffed because Young believed the terms to be onerous. Defendants' production well number 23 is located immediately to the north and west of Young's land, and their production wells numbers 18 and 18A are adjacent to the north and east of his land. Their injection well number 13 is located adjacent to and south of Young's land. The District Court found that

It is established, and undisputed, that the injection of debrominated waters from the defendants' plant through well numbered 13, under high pressure, displaces the brine waters in the formation underlying the plaintiff's lands, forcing it to move toward, and eventually produce through wells numbered 18 and 23. The salt water, by means of this artificially induced

movement beneath the lands of Mr. Young, is carried to the processing plant * * *.

*Id.* at 772.

The District Court ruled that the action was governed by Arkansas law, and this ruling is not contested on appeal. In dismissing the action, the court declared that the decision of the Arkansas Supreme Court in *Budd v. Ethyl Corp.,* 251 Ark. 639, 474 S.W.2d 411 (1971),[1] provided a "clear, concise and unambiguous determination of the law" to be applied. *Young v. Ethyl Corp., supra,* 382 F.Supp. at 774. Relying on that decision as controlling, the District Court held that the common law rule of "capture," as interpreted by the Arkansas Supreme Court, precluded relief.

We cannot agree that the Arkansas Supreme Court decided in *Budd* that the rule of capture protects one who, by force, pushes minerals out from under the land of another when the minerals would remain in place without the application of such force. On the contrary, we conclude that the manner in which the Arkansas court dealt with the plaintiff's contentions in *Budd* indicates that that court declined to rule on the precise issue before us.

In *Budd,* the plaintiff sought an accounting for bromides removed from beneath two nonadjacent tracts of land. The Arkansas Supreme Court treated the two tracts separately, dismissing the cause of action as to each tract for different reasons. The first tract considered by the court was a 240-acre tract in which Budd owned an undivided interest in the minerals. The court found that this 240-acre tract was outside of the recycling area, although adjacent to it. Relying on the rule of capture, the court rejected Budd's contention that the *drainage* of valuable minerals from beneath the tract stated a cause of action. In support of its position, the court quoted the following language from *Osborn*

---

1. That case involved the same recycling project and the same defendants. However, as will be seen from our discussion, *infra,* we find significant factual distinctions between that case and the case *sub judice.*

*v. Arkansas Territorial Oil & Gas Co.,*
103 Ark. 175, 146 S.W. 122, 124 (1912):

* * * "Petroleum, gas and oil are substances of a peculiar character. * * * They belong to the owner of land, and are part of it so long as they are part of it or in it or subject to his control; but when they escape and go into other land or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil or gas extending under his neighbor's field, so that it comes into his well, it becomes his property." * * * [*Quoting Brown v. Spilman,* 155 U.S. 665, 15 S.Ct. 245, 39 L.Ed. 304 (1895)].

*Budd v. Ethyl Corp., supra,* 474 S.W.2d at 412.

Since Young's tract is within the recycling area, the state court's disposition of Budd's cause of action with respect to the 240-acre tract is not controlling.

Having disposed of the cause of action with respect to the tract lying outside of the recycling area, the Arkansas court turned to Budd's second cause of action, which was based on a 40-acre tract which the court found to be within the recycling area—that is, within the defendants' circle of injection wells. Budd owned only an undivided leasehold inter-est in the 40-acre tract, and the defendants owned all the rest of the tract comprising the fee simple and the remaining leasehold. Although the court could once again have relied on the law of capture, it did not do so.[2] Instead, it denied relief because of Budd's limited interest in the property. The court stressed that Budd owned only an "inchoate" interest in the 40-acre tract: the right to drill for minerals if he wished to do so. "Thus there is no trespass upon a vested existing property right * * *."[3] *Id.* 474 S.W.2d at 413. Since Young owns title to his tract in fee simple, the state court's disposition of Budd's cause of action with respect to the 40-acre tract is not controlling.

When pressed on the issue in oral argument, counsel for the defendants conceded that the Arkansas Supreme Court has not yet held that relief for an owner in fee simple is barred by the rule of capture when minerals beneath his land are forced to migrate to the property of another by means of the other's injection wells. Accordingly, the District Court's conclusion that the Arkansas law controlling the issue is "clear, concise and unambiguous," was error. Since the issue has not been determined by the highest court of the state, it is our task to rule as we believe the Arkansas Supreme Court would rule, were the matter squarely presented to it.[4]

2. The dissenter spoke as if he thought that the majority was applying the law of capture to the tract within the recycling unit. *See Budd v. Ethyl Corp.,* 251 Ark. 639, 474 S.W.2d 411, 414 (1971) (Byrd, J., dissenting). We do not read the majority opinion to have done so.

3. Again, the court quoted from *Osborn v. Arkansas Territorial Oil & Gas Co.,* 103 Ark. 175, 146 S.W. 122 (1912):

* * * "A gas lease, such as is involved in this case, is a contract granting to the lessee the right to explore the land and to produce therefrom the gas therein discovered. It is not a present sale or transfer of title to the gas, but, on account of its vagrant nature, the gas does not become actually owned until actually possessed. As is said in the case of *Williamson v. Jones,* 39 W.Va. 231, 19 S.E. 436: 'The title is dependent on finding the gas by the purchaser in a limited time,' —and is inchoate."

*Budd v. Ethyl Corp., supra,* 474 S.W.2d at 413.

4. We have previously declared that "[t]he responsibility of the federal courts, in matters of local law, is not to formulate the legal mind of the state, but merely to ascertain and apply it." *Yoder v. Nu-Enamel Corp.,* 117 F.2d 488, 489 (8th Cir. 1941). This task becomes most difficult when state law is uncertain, but we must not shun the responsibility:

When the rights of a litigant are dependent on the law of a particular state, the court of the forum must do its best (not its worst) to determine what that law is. It must use its judicial brains, not a pair of scissors and a paste pot. Our judicial process is not mere syllogistic deduction, except as its worst. At its best, it is the wise and experienced use of many sources in combination—statutes, judicial opinions, treatises, prevailing mores, custom, business practices; it is history and economics and sociology, and logic, both inductive and deductive. Shall a litigant, by the accident of diversity

In our view, if the Supreme Court of Arkansas were faced with this record, it would hold that the rule of capture does not apply, and that the defendants' actions in forcibly removing valuable minerals from beneath Young's land constitute an actionable trespass. We have reached this conclusion for two reasons.

First, we do not believe that the Arkansas Supreme Court would extend a rule developed in the field of oil and gas to the *forced* migration of minerals of different physical properties. The rule of capture has been applied exclusively,[5] so far as we know, to the escape, seepage, or drainage[6] of "fugacious"[7] minerals which occurs as an inevitable result[8] of the tapping of a common reservoir. The rule was adopted near the turn of the century primarily as a rule of necessity when courts concluded that the amount of oil and gas which drained toward a production well from neighboring tracts was incapable of measurement. *See generally* I Summers, The Law of Oil and Gas § 63 & n. 37 (1954). With the development of more sophisticated knowledge of geology and a greater ability to measure the amount of drainage, the absolutism with which some courts continue to apply the rule of capture to oil and gas has been criticized. *See, e. g., id.* at § 63. We agree with the defendants that the Arkansas Supreme Court foreclosed such arguments with respect to the drainage of minerals from adjacent lands. But Young does not claim that he is losing minerals due to seepage or drainage toward the defendants' production wells. Rather, he asserts, and has established to the satisfaction of the District Court, that the brine solution under his land would not migrate to the defendants' production wells but for the force exerted by the injection wells; in other words, that the brine is primarily "non-fugacious." We believe that it would be unwise to extend the rule to situations in which non-fugacious minerals are forced from beneath a landowner's property. Our conclusion in this respect is consistent with the fact that the Arkansas Supreme Court did not apply the rule of capture to the 40-acre tract in *Budd.*

Second, even accepting the defendants' contention that the brine beneath Young's land must be treated no differently than would oil or gas, the common law rule of capture is not a license to plunder. Rather, it has an important corollary in the doctrine of "correlative rights."[9] This doctrine allows owners of

---

(1948): "It must be conceded that under the law of capture there is no liability for reasonable and legitimate drainage from the common pool."

7. The Oxford English Dictionary (1971), defines "fugacious" as meaning "[a]pt to flee away or flit," and "fugacity" as meaning "volatile."

8. * * * Because of the liquid and volatile nature of oil and gas and their existence in the earth in sealed strata subject to great pressures, one landowner in a common source of supply cannot produce oil or gas therefrom without actually or theoretically causing some displacement of the oil or gas under his neighbor's land. * * *

I Summers, The Law of Oil and Gas § 62 at 157 (1954).

9. * * * The term "correlative rights" is merely a convenient method of indicating that each owner of land in a common source of supply of oil and gas has legal privileges as against other owners of land therein to take oil and gas therefrom by lawful operations conducted on his own land limited,

of citizenship, be deprived of the advantages of this judicial process? * * * We must not forget that a litigant has only one day in court. * * *
* * * Each litigant, whether in the federal or the state courts, has a right that his case shall be a part of this evolution—a live cell in the tree of justice. * * *
Corbin, *The Laws of the Several States,* 50 Yale L.J. 762, 775–776 (1941).

5. As an example of a case where the forcing out of minerals was permitted, the defendants cite *Railroad Commission of Texas v. Manziel,* 361 S.W.2d 560 (Tex.1962). The secondary recovery (injection) operation sustained in that case had been ordered by a state agency to further the public policy of maximizing oil recovery. Obviously, the authority of private actors is not coextensive with the powers available to a state in exercising its police powers.

6. I Summers, The Law of Oil and Gas §§ 61–65 (1954), and the cases cited therein, consistently speak of "drainage" when discussing the rule of capture. *See, e. g., Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558, 562

land to extract oil or gas from a common pool, but posits two duties which limit the right of a landowner to drain oil and gas from beneath adjacent lands: (1) the duty to other owners not to injure the source of supply; and (2) the duty not to take an undue proportion of the oil and gas from the common pool. *See* I Summers, The Law of Oil and Gas § 63 at 180–181 (1954). To violate those duties is to abuse one's correlative rights. This corollary to the rule of capture has been codified in Ark.Stat.Ann. § 53–109(I)(3), which prohibits, as an abuse of correlative rights, "withdrawals causing undue drainage between tracts of land." [10] If causing undue drainage is an abuse of correlative rights, then *a fortiori* forcing static minerals under one's neighbor's land to migrate amounts to an abuse of those rights. The defendants would have us ignore § 53–109(I)(3) by urging that salt water brine is not governed by oil and gas law. They cannot have their cake and eat it too; if the rule of capture is to be applied to salt water brine, the doctrine of correlative rights must likewise be applied.

We conclude that the Supreme Court of Arkansas would not apply the rule of capture to this situation and, hence, would not need to proceed to the alternative question of correlative rights. Accordingly, the appellant has a vested existing property right in the brominated salt water underlying his land, and the action of the defendants in forcibly removing that solution by means of injection and production wells on surrounding property constitutes an actionable trespass. It was improper for the

District Court to dismiss the action. The order of dismissal is reversed, and the cause remanded for further proceedings as to the relief to be granted.

---

however, by duties to other owners not to injure the source of supply and by duties not to take an undue proportion of the oil and gas. In addition, of course, to this aggregate of legal relations, each landowner has duties to the public not to waste the oil and gas.

I Summers, The Law of Oil and Gas § 63 at 180–181 (1954).

10. Ark.Stat.Ann. § 53–110 provides:

Waste of oil or gas as defined in this act is hereby prohibited.

Section 53–109(I) provides:

"Waste" in addition to its ordinary meaning, shall mean "physical waste" as that term is generally understood in the oil and gas industry. It shall include:

\* \* \* \* \* \*

(3) Abuse of the correlative rights and opportunities of each owner of oil and gas in a common reservoir due to nonuniform, disproportionate, and unratable withdrawals causing undue drainage between tracts of land.