## FRIEDE v. MYLES SALT CO., Limited.*
### No. 16715.

Court of Appeal of Louisiana. Orleans.

Nov. 29, 1937.

*Rehearing denied Dec. 13, 1937.

Milling, Godchaux, Saal & Milling and M. Truman Woodward, Jr., all of New Orleans, for appellant.

O'Niell & O'Niell, of New Orleans, for appellee.

JANVIER, Judge.

Vladimir M. Friede claims from Myles Salt Company, Limited, $200, with interest, alleging that to be the balance due for services rendered by him in the preparation of a traffic study involving the advisability of defendant's establishing a transportation system for the moving of its product from its salt mines at Weeks Island, in Louisiana, to a distribution center on the Eastern seaboard of the United States. Defendant, admitting that Friede made the said investigation and reported thereon, avers that it paid him $300, which represents more than the fair value of the services rendered, and denies that any further sum is due, and it especially denies that, in any event, interest is due except from judicial demand.

In the court a qua there was judgment in favor of plaintiff, with interest from June 11, 1936, which is the day on which the plaintiff rendered bill for his services. Defendant has appealed.

There are many facts which are not in dispute. The salt mines of defendant are located in the southern part of Louisiana, adjacent to the newly-completed intracoastal canal. One of the principal markets for defendant's product is centered around Hoboken, N. J., on the Northeastern seacoast of the United States. Defendant's officers conceived the idea that, in the transportation of its product from the mines to Hoboken, a saving might be made by making use of the said intracoastal canal in connection with the Gulf of Mexico and the Atlantic Ocean for the establishment of a line of vessels operating between the said points, and they consulted Mr. Friede, a naval architect, who, apparently, had had experience as a traffic expert, requesting that he investigate and advise as to the feasibility of establishing and operating such a water transportation system. Mr. Friede made the investigation, found it inadvisable to establish the system, and then sent defendant a bill for $500 for the services which he had rendered.

Defendant contends that, when plaintiff was consulted, he stated that it was not his intention to make a charge for his advice

concerning the establishment of a system of transportation, but that, if such a system should be found advisable, there would be contemplated the construction of vessels and that, as a naval architect, he would in all probability be employed to design and supervise the construction of such vessels, and would thus receive his compensation for all services rendered.

Mr. Friede was first approached by Mr. Schaffenburg, the traffic manager of defendant company, who arranged a conference with certain of defendant's officials, and it is at this conference that defendant's officials contend that Mr. Friede stated that he would make no charge for his services in connection with the traffic study. They all admit, however, that Mr. E. B. Benjamin, the vice president and, apparently, the executive head of defendant company, stated that he would not be willing to accept the services without making payment therefor, and that he intended to send Mr. Friede a check in payment for those services. The other officials, with the exception of Mr. Schaffenburg, all testify in a general way to the conversation above referred to, but no one of them is able to fix the amount which Mr. Benjamin stated he would send. Mr. Benjamin says that he told Mr. Friede: "We cannot accept such information absolutely gratis, we will send you a check for $100.00 or so in compensation. * * *"

Mr. Schupp, the general sales manager of defendant, testified that Mr. Benjamin stated: "That we would insist on sending him a check, and the amount, as I remember it, was either $100.00 or $150.00."

Mr. Robert H. Polack, vice president and secretary-treasurer of defendant company, stated that Mr. Benjamin said: "That he would not expect Mr. Friede to do this work for nothing and would certainly expect to send him a check for the work."

Mr. E. V. Benjamin, Jr., brother of Mr. E. B. Benjamin, testified that: "There was no specific amount mentioned, as far as I remember, but my brother was positive in his statement that he would send him a check for an amount."

Mr. Schaffenburg, the traffic manager of defendant corporation, did not state that Mr. Friede had said that he would do the work for nothing, but testified as follows: "Mr. Friede was asked what his compensation would be * * * and his answer was that in such preliminary work it was the usual custom to determine the amount of fee after any ideas were accepted," and, when asked if Mr. Friede mentioned any price, he answered, "no."

If any price had been at that conference agreed upon, or if Mr. Benjamin had definitely stated any particular amount that would be sent to Mr. Friede, there were two subsequent occurrences which would indeed appear strange. One is that very shortly thereafter, when the work was completed, Mr. Friede sent to defendant a bill for $500, and the other is that, when the bill was received, defendant sent to Mr. Friede a check for $300 without protest, and without in any way referring to any agreed amount, and without writing that the $300 payment should be considered as payment in full.

 Surely, if the officials of the defendant company, only a few days before, had heard their vice president say that he would pay $100 or $150 for the services rendered, they would have expressed surprise, or made a protest, when, only a very short time later, they received a bill for $500. Certainly they would not have remitted, without protest and as payment on account of such a bill, an amount more than double the total amount which they contend was agreed upon as the value of the services. Whatever those officials may have believed as to an understanding, we think that it is quite evident that no such understanding was agreed to by Mr. Friede, and that the circumstances were not such as would justify the conclusion that he should be held to have accepted as correct the valuation placed upon his services by Mr. Benjamin, if, in fact, such a valuation was placed on those services. Since, then, the services were rendered under circumstances which do not justify the conclusion that the minds of the parties met on the fixing of compensation, the amount to which Mr. Friede is entitled must be determined on a quantum meruit basis. We must take into consideration the value of the services to defendant, the extent of the report, the time and study spent thereon, and so forth.

It is contended by counsel for defendant that the report could have been prepared in a very few hours; that practically all of the information contained therein was already in the possession of Mr. Friede; and that all that was required was that he prepare in typewritten form certain statements from information already possessed by him.

But an examination of the report does not convince us that that was all that it was necessary for Mr. Friede to do. It was necessary that he investigate the time required by various types of vessels to make the trip contemplated; that he ascertain the time necessary to load and unload each vessel; that he ascertain the cost of operating such a vessel, that is to say, fuel expense, wages of crew, cost of provisions and supplies, etc. All of these things unquestionably required the services of an expert. We also take into consideration the fact that the matter apparently was one of considerable importance to defendant. Had it been decided to establish the transportation system, it would have been required that they expend several hundred thousand dollars, and it was, therefore, no doubt necessary that the advice given them be accurate and based on reliable information. The best evidence of the value of the services can be obtained, we think, from the testimony of Mr. Theodore Brent, vice president of the Coast Transportation Company, who has had vast experience in transportation matters, particularly those involving movements on water. Mr. Brent testified as to Mr. Friede's ability as follows: "I regard him as probably the best in this part of the country. * * *" He also said that he, himself, had prepared traffic studies similar to the one involved here and, when asked as to what he thought of the charge made by Mr. Friede, said: "I think it is quite reasonable—I think it is rather small."

There is no evidence of any other traffic expert, or any one else familiar with the preparation of a study of the kind involved here, which could be considered as contradictory of that given by Mr. Brent. We therefore feel that the services rendered were worth the sum charged, and that, consequently, the judgment for the $200 balance due thereon was correct.

We next consider the question of interest to be allowed and the date from which it should commence to run. Counsel for plaintiff argues that legal interest should have been allowed from the time at which the debt became due, and that that time was June 11, 1936, the day on which plaintiff rendered a bill for services. This argument is based on article 554 of the Code of Practice and on article 1938 of the Civil Code. But counsel for defendant maintain that the claim, until judgment was rendered, was an unliquidated one, and that, therefore, interest should be allowed only from judicial demand.

We note that prior to 1839, interest was not allowed on accounts or unliquidated claims. Until that time, article 554 of the Code of Practice of 1825 provided that: "No interest shall be allowed on accounts or unliquidated claims." We deem it significant that by Act No. 53 of 1839 that provision was repealed. Now, apparently as a result of Act No. 181 of 1852, the article reads as follows: "Interest at the rate of five per cent. shall be allowed on all debts from the time they become due, unless otherwise stipulated."

The Civil Code provision on the subject has sustained a similarly significant alteration. Article 1932 of the Code of 1825 provided that: "In contracts, which do not stipulate for the payment of interest, it is due from the time the debtor is put in default for the payment of the principal, and is to be calculated on whatsoever sum shall be found by the judgment to have been due at the time of the default."

However, that article (1932) of the former Code has now become article 1938 of our present Civil Code, which reads as follows: "All debts shall bear interest at the rate of five per centum per annum from the time they become due, unless otherwise stipulated."

It is obvious that both changes indicate an intention that interest shall be allowed on unliquidated, as well as on liquidated, claims, and that interest shall commence to run at the time the debt becomes due, regardless of putting in default.

Act No. 206 of 1916, providing "that legal interest shall, hereafter, attach from date of judicial demand, on all judgments, sounding in damages, 'ex delicto' " has no application, for, by its own terms, it controls only " * * * judgments, sounding in damages, 'ex delicto.' "

Counsel for defendant call attention to an article in the Tulane Law Review, volume VI, page 614, entitled "The Running of Legal Interest in Louisiana," and point to a discussion therein concerning the time at which interest commences to run on open accounts. The following language is quoted: "The computation of interest on an open account, a problem of every day occurrence, is difficult. The tendency of the courts is to allow interest only from judicial demand. Thus, where the evidence does not clearly show when each particular

item became due, interest is allowed only from that date. Where an account has been rendered and acquiesced in, or admitted, interest runs from the time of acquiescence."

But this is not an open account concerning which there might be difficulty in determining when any particular item became due. It is a suit on one item only, and that one for professional services. In the absence of any stipulation or proof of custom to the contrary, such a claim is due upon completion of the service. Though the service was rendered prior to June 11, 1936, the bill was sent on that day. We therefore think that the judgment correctly allowed interest from that time.

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.